and number 184794 United States v. Scott As soon as the lawyers are ready, come up. If I may. Yes, absolutely. Thank you, Your Honor. Good morning. May it please the Court, for the record, I'm Rick Barron. I'm here today representing Ms. Dawn Cottman, who's the appellate in this case. Ms. Cottman respectfully asked this Court to reverse the decision of the district court in the district court for two reasons. First, the government's irrelevant prejudicial appeal to the jury in this case was a constitutional violation. And second, the government subjected Ms. Cottman to custodial interrogation without Miranda warnings. Your Honor, this case is about an overzealous government prosecution of a tax fraud case. To the first point, which I'd like to focus on, testimony that Ms. Cottman's business named 40 A.M. Tax Services was named after a post-Civil War era slogan, 40 acres and a mule, was irrelevant and racially coded dog whistle appeal to the jury. It's irrelevant that the naming of her business, a celebration or remembrance of emancipation and the promise of compensation, that does not tend to prove that Ms. Cottman intended to steal from the government, nor did it rebut any defense of mistake. 40 acres and a mule stoked racial resentment and encouraged the jury to be skeptical of Ms. Cottman because she is black. How often was the expression brought out by the government? At least two times. Two times, that's what I said. And how long was the trial? The trial was, I believe, a couple of days. And was it referred to in closing argument? I don't believe it was referred to in closing argument. Or in the opening statement? Not in opening statement. Okay. And so the two instances I would direct you to the joint appendix approximately 580 to 589. And then again in the joint appendix from about 730 to 732. Now, what's notable in this case, and what you don't have in most cases that touch on this issue, is that you have a juror who reacted very physically and emotionally to this statement. When the government first tried to elicit this testimony, there was an objection and a request to approach. The court, sua sponte, and I'm using the court's own words, abruptly recessed because there was a reaction from juror number two. And the court said, quote, they're concerned. He's concerned. As a result of the last statement, that 40 acres in the mule testimony, the juror expressed a clear emotional side. He put his head in his hands and was shaking his head. The court continues. The triggering comment, again, 40 acres in the mule, and the trigger here was his animation regarding his reaction to the statement. The prosecution confirmed 40 acres in the mule. What was the name of our business? 40 AM Tax Services. 40 AM. Where did that come from? 40 acres in the mule. So the government tried to elicit testimony that came from 40 acres in the mule. Where does it come from? Where does 40 acres in the mule come from? What is the business name? Where did it come from? What does the business name come from? What does the 40 AM come from? I presume AM is acres in a mule. Didn't the government witnesses testify that that's what Ms. Cotman said it stood for? Yes. But the government is arguing that that phrase is evidence of criminal intent. That phrase alone. How so? Exactly. But, I mean, even if you argue it, I'm trying to understand the term 40 acres in a mule. It's a positive thing after the war of an intent. What is it? Well. You're saying here the connotation is you didn't get your 40 acres in a mule and now come and get your 40 acres in a mule? Well, I think that's what they're alluding to. The point here is that there are widely divergent views or connotations of the phrase 40 acres in a mule. Now, some might have a very, for some it may be very positive, for others. 40 acres in a mule in and of itself, you don't mean that in and of itself as a racial stereotype, do you? Not in and of itself. That's what you maintain. That's what's so hard to understand. The context, the historical context. Let me hear it again. The term 40 acres in a mule, you're saying that alone is a racial stereotype? No. That alone is not a racial stereotype. Didn't one of the government's witnesses at JA 731 to 732 say, the question was, and why did she call it that? And the answer is 40 acres in a mule, comma, give me mine now. Right. So the government didn't just say the name was 40 acres in a mule. The government said 40 acres in a mule, give me mine now. Well, the first testimony about 40 acres in a mule, there was no testimony about any additional comment. No, I understand. I'm trying to perhaps give you some argument that maybe that's what made this otherwise not negative name, 40 acres in a mule, attach it to some negative context because the government didn't just say 40 acres in a mule. They said, give me mine now. I mean, they can respond to that as to maybe that's what Ms. Cotton herself said. And our argument with all due respect is that that is completely irrelevant. Who knows what that means? It certainly doesn't tend to prove that Ms. Cotton intended to defraud the government. Any argument of that nature is completely irrelevant and certainly outweighed by the potentially prejudicial effect of that phrase. I think it's irrelevant, too. What I'm having problems with is the prejudices. Well, you know, I think the point is that to some, some people may not hear that whistle, 40 acres in a mule, but there are quite divergent views and connotations when someone may hear that. Were you counsel at trial? No, I was not. I know you're court appointed, but sometimes. Oh, yeah. Right. But the district judge is, in fact, an African-American. He didn't think that was a problem. Well, the fact that he's African-American doesn't mean that he may or may not hear the. I thought you thought this was a whistle that showed prejudice to African-Americans. Am I misunderstanding your argument? That's the argument. But that doesn't necessarily mean that the judge, simply because he's African-American, would hear it in the way that. It doesn't necessarily mean that, but it is a factor. It may be a factor, but it doesn't necessarily mean that he would hear it in a way that someone who may be prejudiced hears it, like, for example, potentially juror number two. But wasn't juror number two removed? Juror number two was removed after he made gyrations in the jury gallery and was approached and admitted that he had an emotional reaction to the term 40 acres and a mule. Certainly, if you imagine the courtroom, I wasn't there, but I'm sure all of the other jurors heard that testimony and saw that juror's reaction. And regardless, we just happen to have a great example of an emotional, irrational reaction. Did he say what this struck him? I mean, help me here. Did he say, I heard that and I knew that they were out to get African-Americans, or did I say, I heard that and I laughed, or I don't understand. What did he say? I understand he had a big reaction. Do we have in this record why he had this big reaction? What he said, he said, it was an emotional reaction to the testimony, 40 acres and a mule. Not an intellectual one, an emotional one. That answer, 40 acres and a mule, made me go over the line. Got you. But I don't know which way he's going. Well, it looks and sounds like he's going against my client because of 40 acres and a mule. Maybe we just failed to go against the government. I'll try to explain. 40 acres and a mule, to some, is just a historical fact, a promise made that didn't happen. For others, unfortunately, 40 acres and a mule is a statement of entitlement to a certain group of people who believe they should get something because their ancestors were enslaved. And there's a resentment from certain members of the populace about that. And this was an appeal to that. That sounds interesting. I, quite frankly, hadn't heard that, but it does sound reasonable. I never thought about it as being anything other than what it was, a promise that was unfulfilled by the government that said they would give you 40 acres and a mule. But I can see what you mean. There would be people out there who could conjure up a prejudicial attitude that, well, they think they're entitled to something because they didn't get their 40 acres and a mule. And for those who assert it, that's what they're doing. They're doing it because they didn't get their 40 acres and a mule. That's what we have here, reparations. We know it as reparations today. Which is why when the government said that the answer is 40 acres and a mule, give me mine now, illuminates, perhaps, your argument about prejudice. It doesn't do very much to illuminate the argument about prejudice. Okay, well, it sounds prejudicial to me, that statement. I thought that, you know. I thought she was helping. I mean, it doesn't illuminate the relevance. But that makes the entitlement argument. That's what it sounds like. Yes, I'm sorry. That they're trying to make it sound like she feels entitled. I'm sorry, I misunderstood, Your Honor. I misunderstood, Your Honor. Yes, it totally illuminates the prejudice. Sometimes we're actually trying to help. I understand. It totally illuminates the prejudice in this case. What it doesn't illuminate is the relevance. Tell me, procedural trial, what happens? Okay. So these comes out. There's an objection made. Yes. And the objection's overruled. The objection made as to approach. Okay. The court says, I'm abruptly recessing. I abruptly recessed because there's a problem here. In response to this testimony, this testimony triggered this juror's reaction. No, no, no, that happened later. This is the first. This is the first instance, JA 580. This is the first instance. They asked the juror to approach. What does the court do once you bring this to the attention of an objection? Is it sustained or overruled, or how does that happen? The objection is overruled, but the court has a colloquy with the juror, dismisses the juror, admonishes the jury, and then moves on. Then later on, we have additional testimony, 40 acres and a mill, give me mine now. There's the same objection. It's overruled. The court notably says, I don't find this racially offensive. One might presume that an African-American wouldn't find it racially offensive. This is a historical fact, and he mentions 40 acres and a mill production company. Away from this going to the prejudice prong, and so you get into the prejudice prong of it, then you've got to be able to say that even without this proper use here, is there sufficient here, or at least if it was reasonable, rational juror was going to arrive at it. And the evidence here is highly probative of her intent and knowledge of what she was doing. And, I mean, I would say it looks like it's overwhelming to me in the face of this. I mean, yeah, if we said it was an error, and as you say, some people feel this way, some don't. I can imagine there's a community of people who would feel that way. Actually, you educated us very well. You educated me on this, and I got it where you're going with it. I can see where you're going with that. But to prevail on this, you're going to have to show prejudice, and there's a lot of evidence here. Here, when there's an appeal to racial prejudice without any real relevance here, there is an overwhelming evidence, but you don't even have to show that. This is structural error. You can't do it, no matter how much evidence you have. It's a structural, constitutional due process. The racial prejudice you allege does not arise from the fact that she happens to be African American alone. It doesn't arise from anything. It is a phrase, and the phrase, you say, has racial connotations because it applied after the war only to African Americans of promise unfulfilled, for which they now seek to have fulfilled. And that's not a direct type racial stereotype where you have an instance where it's more evident. It's a direct thing because you happen to be of a particular race. This is something that was said to a group of people, and they didn't get it, and now you say, and it just so happens she's being charged that kind of offense. Had this been in a different kind of case, you know, this is a taking state case where you supposedly have taken stuff, and the idea is she is taking it for this purpose. If I could answer the question, I would respectfully disagree. The context of 40 Acres and a Meal, today's conversation about reparations, this was a direct appeal to race within the context it was used. And, therefore, prejudice this case automatically, structural error, and appeal to racial prejudice in connection with the historical context and the same conversation we're having now about entitlement to reparations. But she's the one that named her company. The government didn't name her company. She named her company. Right. The government just asked her what that stands for, and she said 40 Acres and a Meal. Didn't ask her what that stands for. But get this. She named it that, and she could have left off the A&M. It says 40 Acres and a Meal. Does that change anything? I mean, if she gets on a stand and says essentially what she said, it really does go toward intent. If that's what she did, she may have been one of those people who actually felt that she was entitled to something because of the 40 Acres and a Meal. The government has to show that it goes to intent and willfulness. There was no mistake here. Just because you name your company something doesn't mean that you intend to perpetrate them. But it is a company that does just that. It is a company. She's filling out all of these. There's no question she's done this, all these tax returns. I mean, it's just – There is questions that she's done this, respectfully, Your Honor. Not when you are appealing in terms of sufficiency. You haven't appealed sufficiency of the evidence. You're appealing this one thing here. So if you're challenging the sufficiency of all, which I think I'm correct. What was your first? Well, when you have a statement that infects the whole of the trial, we don't – What's the first argument you have? What's the first one? The first one is that you didn't reach. The non-Miranda's statements in the basement. Which is when she told him the name of her company. You're not challenging the sufficiency of the evidence itself. You're not trying to get a conviction overturned because you say she is not guilty because the evidence was insufficient. You're saying this evidence prejudiced their reasonable doubt determination. So in terms of the sufficiency of the evidence based upon showing that there are facts that establish she did it, it's there. The only question is, is it sufficient for a reasonable doubt? Would this have created a reasonable doubt? I don't know how that's going to happen given the evidence that shows she's done it. All this shows is they could have had prejudice to some extent. They could have viewed it in a slanted way, but the evidence is there. The case law is clear that when you have an appeal to racial prejudice, it doesn't matter how much evidence you have. That's an offense to the Constitution, an offense to any criminal case. Let me ask you one last question. When you started the case, whoever started it, they knew the name of this business, didn't they? Yes. Did they voir dire that jury and say, do you know what this phrase means? Did that come out in voir dire? Because if you didn't, it would sound like to me, but think about it. A reasonable lawyer who would have noted that that phrase has a negative connotation, and you're about to voir dire a jury, and you feel there are folks on this jury up here in Maryland or wherever who could feel that has a negative connotation. Because you don't have to say a word. The government could have said nothing. They could have said, that phrase means voir dire. And that negative connotation you say they already possess, they're going to get it whether you say it or not. It could be like, you know, they wore a black face. You don't have to tell them why they wore a black face. You already know that has a negative connotation. So my question is, at the start of this trial, I cannot imagine a lawyer who would have a case with what you contend has a negative connotation of a racial stereotype as a name of a business would not immediately ask every juror up there, do you have any feeling one way or the other as to this phrase, voir dire. Do you know what it means? Do you have any negative connotation? They say, yes, I trial them for a cause. Or at least I would get rid of them on a preempt if I could. Your Honor, I think you make a great point. But we hold the government to a higher standard, even if the defense does not do what you propose they should do, which would have been great. But we hold the government to a higher standard. And nevertheless, without all of that, they're not supposed to bring it into this court with a racial prejudice. I got that. And I'm not going to say they should. I don't mean that. But I'm looking at it from the perspective of the context of this statement and how it's used here. You've got to really reach not far to get it to be a racial stereotype. And if you do, show that prejudice is a big reach. I mean, they're racial stereotypes. And we cannot use cases like this where you have these kind of racial stereotypes where you've got to really figure out what it is, and then you have real ones that you don't have to figure out what it is, and it gets to be problematic. I intended to reserve some time. But how does this court know which is, you know, this court determined that King Kong was unfairly prejudicial and appealed to race. This court in Bennet v. Sterling. So if that, I would think most certainly the phrase 40 acres and a mill. That's very different. Very different. Very, very different. Thank you very much, sir. I think reasonable minds could disagree. And if reasonable minds could disagree. Sir, your time has expired. Thank you. Thank you very much. You're, in fact, almost seven minutes over. Stop talking. May it please the Court. Sean Delaney on behalf of the United States. I would like to begin by addressing a number of questions that I heard your Honor raise during the call for you with my brother. Begin with Judge Motz's questions regarding length of trial and the point in time which this issue was raised. The trial lasted not a couple of days, but six days is my recollection. This testimony occurred on the third day through two witnesses. Through my review of the record, these are the only two occasions on which this testimony was elicited or referred to. I did not see a single reference to it in any of the opening or closing statements or the rebuttal. To address. And can you clarify for me the second, when Shanti Brown testified and, is that a man or a woman? A woman. It is a woman, Your Honor. When she testified, she testified as to the name of the company being 40 AM Tax Services and that Ms. Cotman explained the name to her, why she called it that. And then Ms. Brown says, 40 acres and a mule, give me mine now. Is that something, the give me mine now, is that something Ms. Brown added or is that something Ms. Cotman said? Those are Ms. Cotman's words. Those are Ms. Cotman's words to Shanti Brown. That was the testimony at trial. I will note also that this issue was raised by the government to Judge Russell prior to the testimony. How do we know they were Ms. Cotman's words? Shanti Brown testified they were Ms. Cotman's words. This was proffered to Judge Russell before this testimony was elicited. My reading of the record was that the objection that brought us up to the bench in the first place was an objection to a different question, ultimately eliciting the testimony that Ms. Cotman was going to ride this to the wheels fell off. Who was Shanti Brown? Was she a client of hers? There were three co-conspirators who testified at this trial, and this would get to the weight of the evidence. There were three co-conspirators who testified at trial, Ms. Monique Montgomery, Shanti Brown, as well as Tangeba Cross. I want to know about Shanti Brown and that state. She says this is what she said, and she was a co-conspirator with it. So she was part of this? How did she have an interest? Did she have an interest in the business? How was that? Shanti Brown sold identifications to Ms. Cotman for the purpose of Ms. Cotman preparing false tax returns. The question, and I'm going a little bit based on my memory, but I believe the question was, what did 40-AM tax service stand for, the answer being 40 acres and a mule? And what did Ms. Cotman tell you it meant? Give me mine now. They were Ms. Cotman's words as to the name she chose for her company that she used, along with Ms. Shanti Brown, to prepare false tax returns. So your position would be, as evidence to show Ms. Brown was using this, deliberately so, for the racial stereotype that the opponent seems to indicate is being used, said in court, that she's the one that did it. If she gives testimony, it means 40 acres and a mule, and then someone testifies, and I take it, was that testimony objected to? Was Ms. Brown's testimony objected to? Yes. The elicitation of 40 acres and a mule was initially raised by the government, that it was proffered by the government to the judge and objected to, as well as a proffer as to the follow-up statement of what did that mean. That was proffered to the judge, objected to by defense, overruled by Judge Russell. So there was evidence here that that was a name, and I take it the defense then could present evidence to refute that, because if it goes to a question of whether it's a credibility situation, and did the defense present evidence to say, no, this did not mean that? I do not recall any cross-examination on the meaning of that phrase of any of the co-conspirators, specifically not of Shante Brown, nor do I recall any argument during closing arguments that it did not mean what Ms. Brown said it meant. Specifically, I will note, and this gets to... But let me understand, the objection to her testimony, what was the basis to objecting to her testifying that's what she said? It was a hearsay statement, but what is the objection? The objection was that it was inflammatory testimony. But inflammatory, I don't get that. I'm trying to say inflammatory is true, but you can't testify because it is inflammatory. Yes, it was a 403 objection, that it was unduly prejudicial, and the prejudicial value outweighed the probative value. When Judge Russell conducted a 403... I feel like I'm in an evidence class, but it's intriguing me, because what I'm thinking about, you have the declarant is to have said something. They object to something they are to have said, because what I am alleged to have said is inflammatory? Yes, Your Honor, that was the objection. That goes nowhere. We, in fact, conducted two 403 balance tests. The first occurred after the government's proffer of this evidence. Then the name of the company was elicited through the testimony of Monique Montgomery. The government again raised this issue. If it's an opinion of this person, then you've got something. But if she is saying, this defendant said this, and then said the objection is inflammatory, the objection is overruled, even if you do the balancing test, then it comes on cross-examination, the defendant can then come back and challenge the credibility of this witness' statement, even for the making it, you know, she's making this up or something like that, or it doesn't mean that, and none of that happened? No, Your Honor, not to my recollection. And to get to Judge Thacker's point regarding prejudice, Your Honor is absolutely right, that to the extent the prejudice comes from the phrase, and to Judge Wynn's point, the phrase 40 acres and a mule in itself does not carry with it prejudice. It is a phrase, it has a meaning. But it's a phrase that is alleged to have come from the defendant. Yes, Your Honor, that is correct. In the context of the come, which frankly I've never heard it that way. She said, come what, come? Give me mine now.  Yes, Your Honor. And that is. I'm trying to understand how is that inadmissible? If a witness testifies that a defendant makes a statement, is it subject to a 403 balancing test? Not to make appellant's argument for him, but I believe that if the testimony was so unduly prejudicial as to outweigh its probative value, Judge Russell would have been justified in excluding that evidence, which is why we raised it for him in the first place. But if you have a business that's set up and an allegation that is used to defraud money out of the government or whomever, and the government has taken it and then you set up a business, you name it that, and the name implies, even with an additional statement, that's what you're doing. I'm not in love with the argument. I'll have to study this a little bit more, but I'm thinking from an evidentiary perspective. Forget about that. And I understand a racial prejudice can be there, but if it arises from the defendant, and that is what they're being charged from, sometimes you can use things like that, you think, for your own advantage. And that's the allegation that even though it's a racial stereotype, this defendant was using a racial stereotype for her advantage. Is that what I'm understanding is going here? I believe that the—are you asking as to appellant's argument as to what— what is testimony elicited? The testimony elicited the name of the company and her purpose in naming the company was give me mine now. Now reasonable minds can differ as to the value of that testimony and whether or not that actually proves the defendant's intent or the defendant's criminal intent. To Judge Motz's point, she had difficulty figuring out the relevance of the testimony altogether. To Judge Thacker's point, it was the phrase give me mine now that in fact had prejudice. But the defendant's attorney says it does have that—almost like it has a general connotation of being that. And it may well be that we didn't know that, but in certain communities, if you know that. My statement is if the defendant herself knew this, set up a business to defraud the government out of money, tax money, and then says I named my business 40 Acres of Mule, come to get mine or something like that. It's probative. I agree with you wholeheartedly and I believe Judge Russell agreed with that as well. When he made his findings specifically stating he coupled the name of the statements with the reason for the name. And I submit— It's not about racial stereotype at all. It's about probative evidence that this defendant, who happens to be African-American, uses that stereotype for that purpose. That's the probative value. Whether it's true or not, you know, subject cross-examination, you can come back with additional evidence. But I'm having some difficulty. Absolutely. And certainly I would argue that there is no unfair prejudice in this instance when it was in fact the defendant herself who selected this name and gave it its means. That certainly the defendant is not— In other words, you're saying it would be a different case if the government alleged that this is what she named her business. What that meant. That is precisely correct. And she denied it. That is precisely correct, Judge Motz. And getting briefly, we mentioned Bennett v. Sterling. I think it's important to be very clear what we're talking about when we're using case analogies here. Let's talk about what Bennett v. Sterling had at issue versus this very simple phrase and the meaning the defendant attributed to it. Bennett v. Sterling, the 2016 case, had statements made by the prosecutor that the court called racially charged language from the first sentence of his opening argument to his final soliloquy. A far cry from what we're dealing with here. There are two references made by witnesses on the stand as to Ms. Cotman's own words. The racially charged labels in that case were, quote, King Kong on a bad day, caveman, mountain man, big old tiger, beast of burden. These are epithets. These are stereotypical racist phrases used by a prosecutor in court, not the statements of the defendant evidencing her intent. There was an allusion to a mixed race relationship by referring to the defendant's sexual partner as the blonde-headed lady. And then there was testimony regarding a dream from a witness of being chased by murderous black Indians. We are nowhere close to Bennett v. Sterling in this case, nor are we close to Miller v. the state of North Carolina. This involves the defendant's own words and her choice of those words. Miller v. North Carolina refers to, again, prosecutor's statements. There aren't any statements at issue by prosecutors in this case at all. In Miller v. the state of California, there were repeated references to the defendants as, quote, these black men. Ultimately, there's an argument in Miller v. the state of California that a consent defense to rape charges was untenable because a white woman would not consent to sexual relations with a black man. Specifically, the, quote, argument by the prosecutor in that case, I argue to you that the average white woman abhors anything of this type of nature that had to do with a black man. It is innate within us. These are not what is at issue in this case. I reject any assertion that these cases are at all applicable to what is at hand. Can you address the other argument that's been made? I'm sorry, I just missed it. I didn't hear you. I said, can you address the other argument that's been made? As to suppression, the suppression of the statements, Your Honor? Yes, whether she was in custody or not. Certainly, Your Honor. With regard to suppression, the defendant was not in custody when she chose to remain at her residence and answer questions freely in her home. Well, how many police officers greeted her as she came into her home? So she drove up to her home. Right, and two officers came out to greet her. And then how many were there altogether? The test, I do not have the exact number in front of me. Well, I have it if you don't, but it was a lot of officers. I agree. I think we went into double digits in the number of officers. I believe that it was over 20, Your Honor, but the number of agents who were actually conducting the interview, number two. Right, but they took her through the house and they were searching all over the house. They took her down to the basement, a confined area. If I had 20 agents running around my house, I'm not sure how I'd feel about leaving. Referencing the basement, Your Honor, I think it's important to note. I know. It's a club basement, do you think? I'm going to step back from the phrasing. I don't think it's important if you call it a living room, club room, basement, what have you. There was a door, wasn't there? There was a door to the outside at the ground level, which I submit means there were two entrances into the room, not just one. I live in Baltimore. I know those club basements. They sat on a couch in a finished basement, club room, living room, whatever you would like to call it. It's a far cry. Do we have pictures in the record? I looked, and while there are pictures referenced in the record, the pictures did not make it into the record. There is description of the basement. There is description of how the agent sat on an L-shaped couch in that basement. I would note that if we're talking about whether or not Ms. Cotman was in custody during that interview, I think we should immediately jump to the end of the interview because that tells us what we really need to know. She was never told she was free to go, was she? I do not believe that there is something in the record, a statement by an agent in the record that said you are free to leave. Indeed, the agents are asked, did you tell her, or at least one of them is, and you didn't know. But most importantly, as to whether or not she felt free to move around and free to leave, at the end of the 40-minute conversation, she has her purse next to her, the phone rings, and she takes a five-minute phone call in the presence of the agents. No, no, she goes to get her privacy because she's talking to her lawyer. And talk to the police. And she felt free to pick up the phone. I think that is some of the best evidence as to whether or not the defendant did not feel free to move around and felt that she was restrained to the point where she would feel she was in custody. I think that phone call is very telling. I also think that this case is nowhere close to Hashime. I hope I'm pronouncing that case right, which is the other case cited involving a basement interrogation. That basement interrogation didn't take place in the finished portion of the basement. It took place in a storage room adjacent to the finished portion of the basement. That was a 19-year-old boy who was roused from his sleep in his boxer shorts, marched downstairs with someone holding his arm, facts that are not present in this case, taken outside on a chilly day, not given socks or shoes, separated from his mother who had had brain surgery and who had been denied the opportunity to simply lay down, interrogated for three hours in that basement storage room, while his mother asked on three different occasions if she could get access to him so that he could get a lawyer, and she was denied. Yeah, no, I think it's factually different than that. Usually when we look at these cases, we look at several things. If the police say that you have a right to leave, it's not happening here. How many police there are, lots here. Whether the police are armed, they are here. How long the interview is, it's long here. And we look at whether, in fact, the person says, testifies, or claims that she was not free to leave, right? And she does claim that, right? I would note that the interview is conducted, there is a search warrant conducted at the house, and the search does not occur with guns drawn or battery. No, but guns were at hand. I agree that there was a knock at the door, and then the agents were let in. Ms. Cotman wasn't even home at the time. No, they waited for her to leave. She arrived later, and when she arrived, no guns were drawn. The agents approached her, and I don't believe there's any testimony that any guns were out at that point in time, though I do readily concede that they are armed. Everybody was carrying guns, but Ms. Cotman, as far as I can tell. Excuse me? Everybody was carrying guns except Ms. Cotman and her family. I would not. All the officers had guns. I would not. But I agree with you. There's no evidence that guns were out. The findings of the defendant or the findings of the district court was that the request to speak was made in a manner, quote, as to not made in a manner as to intimidate the defendant. It was her choice to go in, and even though I don't have in the record a statement saying you are free to leave, it was her choice to go inside. And, in fact, she was free to leave as evidenced by the fact that after the interview. But her daughter was inside. And she was given an opportunity to see her daughter. The record is clear that she came to see her daughter and spoke with her brother before making the decision to go conduct, to have an interview. And I think you can look to her, the way in which she conducted that interview and the ultimate statements, which I would submit weren't all that valuable in the trial. Well, I was just, but the government makes no claim that this was harmless error. I mean, even if it was error, it was harmless, right? The statements she made were merely false exculpatory statements. I hear what you're saying now, but if I look at your brief, am I going to find an argument that even if this whole incident was a violation of the Constitution, any evidence that was gotten from it did not affect the outcome of the trial, and therefore was harmless error? The government doesn't make that argument, does it? Have I misunderstood your argument? Your Honor, I'm not sure if Mr. Clark's brief makes that argument specifically to the extent it was not. It should have been made. It was harmless error, but I understand at this point in time. I would note that the false exculpatory statements made by Ms. Cobb showed her comfort in the conversation. This wasn't a 19-year-old kid whose will was overborne. She had a cordial conversation where she provided false statements to the agents, saying that she ran a tax preparation business and the information came from her clients. Well, this might go counter to the non-made argument that any error was harmless if she made these exculpatory statements that the agents then testified to. You tell me. Is that what happened? The agents did, in fact, testify to her false exculpatory statements. That is correct. So maybe there's no claim for harmless error. Ultimately, Your Honor, I don't think that the questioning in this case rises to the level of this Court's other findings regarding custodial interrogations. I don't believe that it rises to the level in those cases. You've looked at all of our cases about this. What's the longest period of questioning that was said was all right? I know that this was 40 minutes. I know this one was. What I'm asking you is what other case from our Court says something like 40 minutes? I am struggling. Yeah, me too. I'm struggling to know what the time, nor do I think that the analysis, and I do see I'm over time if it's okay to answer this question. I do think that the time matters, but the time is not dispositive. No. I also don't think that a 40-minute cordial interview is comparable to a three-hour interrogation, and the language used, there's consistency in the record that it was a polite conversation, not an interrogation similar to Hashime. Okay. Seeing no further questions, thank you very much. We have no further questions. For the record, you're 55 minutes over, not six and almost seven minutes. I just wanted your colleague on the other side to understand he's gotten some additional time already. But do you have some rebuttal, sir? Just very quickly on the second issue, she was called back to the home, if I remember correctly from the record, and then officers stood on both sides. I didn't understand. I don't know who called her, but I didn't understand the officers called her. Do you think that's in this record? I don't think so. I may be wrong, but she comes home. She comes home. She comes home. She's in the driveway. Officers on both sides of her vehicle escort her in. She sees her family sitting prone, I believe, on the couch right inside the home. Prone. They're so prone. They're sitting down. The police are searching the house. So I don't think it's fair to say that they're 15 people. If you can imagine from her perspective, she's in her own home, and her family is sitting clearly not in a position where they look like they're free to leave. Although there's no evidence in this record that they were not free to leave. I don't recall any evidence that they were not free to leave, that anybody said anything. But certainly walking into your home, seeing all of these armed agents, seeing your family just sitting down near the entrance and then being asked to go down to the basement for questioning, I don't believe anybody in those circumstances would think that they were free to leave, surrounded by agents, escorted down, all of that. There's no evidence that she said she wanted to leave, right? I mean, we just don't have them saying to her, you are free to leave, and we don't have her saying, well, am I under arrest, can I leave now? We don't have that. We just don't. We don't have that. But I would say from the surrounding circumstances, a reasonable person would not have felt free to leave. And just really quickly, if I might, on the first issue, it would be different if the government had some evidence, more evidence surrounding this name, that this was the intent, through the name, an intent, the criminal intent was here. They didn't have that, and they just took a real leap here and inferred that and made that argument with this statement of her business name and the additional supposed purpose, give me mine now, whatever that means. They made that leap. The government made that leap. Ms. Cottman didn't. There's no evidence that she was making that leap. Somebody testified to that. Her co-conspirator testified. She said it. Right, but, I mean, she said that's the name of her, that she didn't say, I'm naming my business 40 Acres and a Meal because I intend to defraud the government. I don't even think that that necessarily, that get mine now, you know, this shows you how naive I am. But it seemed to me like even if you associated this with the Civil War, people had gotten what the government had provided, and now with good tax returns, they are going to get what the government should not get. They're keeping the government from taking money from them that they don't really owe. So it had a benign meaning, it seems to me. Not a benign meaning and intent for Ms. Cottman. Right. But the government is saying, no, the intent, they're making that leap and making that argument. I totally understand what you're saying, but Judge Wynn has pointed out, you know, she has a lawyer there. They can make arguments. Right. I mean, this was such a big deal. It seems to me that was a perfectly good argument to make, a perfectly good argument to get witnesses in. Sure. And that's all very well and true. Our argument here is that the government is held to a higher standard, and for something like this that is so potentially prejudicial, they should not have made the argument in the first instance. Thank you. We done? Mm-hmm. Thank you very much. We'll ask our clerk to adjourn court for the day, and then we will come down and greet the lawyers. Oh. This Honorable Court stands adjourned until tomorrow morning. God save the United States and this Honorable Court. Ms. Barron, I understand you were court appointed, too. I'm sorry you're failing this morning. Thank you very much for your service. You did a fine job for your client.
judges: Diana Gribbon Motz, James A. Wynn Jr., Stephanie D. Thacker